# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF FLORIDA
# GAINESVILLE DIVISION

### CASE NO: 1:15-cv-00206-MW-GRJ

UBER PROMOTIONS, INC.
a Florida corporation,

        Plaintiff,

    vs.

UBER TECHNOLOGIES, INC.
a Delaware corporation,

        Defendant.

_____ /

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT UBER TECHNOLOGIES, INC.'S OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ...................................................................1

II.     STATEMENT OF FACTS ........................................................2

III.    LEGAL ARGUMENT..............................................................8

    A.      No Preliminary Injunction Is Warranted Because Plaintiff Has
    Failed to Show a Likelihood of Success on the Merits........................8

        1.      Plaintiff Has Failed to Show It Has Prior Enforceable
        Trademark Rights in Any UBER-Formative Marks
        Against Defendant for the Relevant Goods and Services..........9

            a.      Defendant's Federal Registrations Give It
            Presumptive Nationwide Rights, and Confined
            Any Conflicting Rights Plaintiff Had To Its
            Trading Area As of the Registration Dates. ...................9

            b.      Plaintiff Has Failed to Prove Common-Law Rights
            to Any UBER Trademark For Services Related to
            Defendant's As of Defendant's Registration Dates. .....11

            c.      Even if Plaintiff Can Prove Senior Common-Law
            Trademark Rights, They Are Limited to the
            Gainesville Area. ..........................................................13

            d.      Plaintiff's 2015 Florida Trademark Registration Is
            of No Moment................................................................15

        2.      Assuming Plaintiff Has Met Its Burden of Proving
        Common-Law Trademark Rights, It Has Not Shown a
        Likelihood of Confusion. .........................................................15

            a.      Plaintiff Has Failed to Show That Its Mark Is
            Strong in the Marketplace..............................................17

            b.      Viewed in the Context in Which Customers
            Encounter Them, the Parties' Marks Are
            Significantly Different....................................................18

            c.      The Parties' Services Are Not Closely Related............20

# TABLE OF CONTENTS
## (continued)

Page

    d.    Customers Purchase the Parties' Services Through Different Sales Channels. ...............................................23

    e.    The Parties Promote Their Services by Different Advertising Methods. ....................................................24

    f.    Defendant Adopted Its Mark in Good Faith and Certainly Not to Create Confusion with Plaintiff..........24

    g.    Plaintiff's Evidence of "Actual Confusion" Only Shows Inattention and Indifference, Not Confusion As To Source. .............................................................25

    h.    The Parties' Customers Are Careful in Purchasing Their Respective Services. ...........................................28

B.    Plaintiff Has Not Shown That It Will Be Irreparably Harmed If Defendant Is Not Enjoined From Using Its UBER® Trademark in Florida. ........................................................................29

    1.    Even If Plaintiff Proved a Likelihood of Confusion, That Would Not Entitle It to a Presumption of Irreparable Harm.................................................................................30

    2.    The Alleged Instances of Actual Confusion Are Not Sufficient to Support a Finding of Irreparable Harm...............31

    3.    Plaintiff's Lengthy Delay in Seeking an Injunction Belies Any Likelihood of Irreparable Harm. ......................................31

C.    The Balance of Hardships Favors Defendant as an Injunction Would Effectively Push Defendant Out of Florida, While Denial Might Cause Misdirected Calls and E-Mails to Continue. ..............................................................................33

D.    An Injunction Would Harm Defendant's Customers, Drivers, and the Florida Economy Generally, and Therefore It Would Not Be in the Public Interest. ............................................34

E.    Any Injunction Should be Conditioned on a Substantial Bond of No Less than ████████. .................................................35

# TABLE OF CONTENTS
## (continued)

**Page**

IV.    CONCLUSION...............................................................................35

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*A&H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*,
   237 F.3d 198, [231] (3d Cir. 2000) ................................................................. 17

*American Sec. Bank v. American Sec. & Trust Co.*
   , 571 F.2d 564, 567-68 (C.C.P.A. 1978) ......................................................... 11

*Armstrong Cork Co. v. World Carpets, Inc.*,
   597 F.2d 496 (5th Cir. 1979) ................................................................... 16, 28

*Beta Upsilon Chi v. Machen*,
   559 F. Supp. 2d 1274 (N.D. Fla. 2008) ............................................................ 8

*Custom Mfg. & Eng'g, Inc. v. Midway Servs., Inc.*,
   508 F.3d 641 (11th Cir. 2007) ......................................................... 8, 15, 25

*Duluth News-Tribune v. Mesabi Publishing Company*,
   84 F.3d 1093 (8th Cir. 1996) ........................................................................ 27

*In re E.I. du Pont de Nemours & Co.*,
   476 F.2d 1357 (C.C.P.A. 1973) ..................................................................... 19

*E.R. Squibb & Sons, Inc. v. Princeton Pharmaceutical, Inc.*,
   No. 88-6527-Civ-ROETTGER, 1990 WL 272707 (S.D. Fla. Sept.
   4, 1990) ...................................................................................................... 27

*E. Remy Martin & Co. v. Shaw-Ross Intl Imps., Inc.*,
   756 F.2d 1525 (11th Cir. 1985) ..................................................................... 19

*eBay Inc. v. MercExchange, L.L.C.*,
   547 U.S. 388 (2006) ................................................................................. 30, 31

*In re Eilberg*,
   49 U.S.P.Q. 2d 1955 (TTAB 1998) ................................................................ 11

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Ferring Pharm., Inc. v. Watson Pharm., Inc.*,
    765 F.3d 205 (3d Cir. 2014) ................................................................31

*Frehling Enterprises, Inc. v. International Select Group, Inc.*,
    192 F.3d 1330 (11th Cir. 1999) ...................................16, 18, 20, 23

*Glow Industries, Inc. v. Lopez*,
    252 F. Supp. 2d 962 (C.D. Cal. 2002) .............................................20

*Hana Fin., Inc. v. Hana Bank*,
    135 S. Ct. 907, 190 L. Ed. 2d 800 (2015)........................................10

*Herb Reed Enters., LLC v. Fla. Entm't Mgmt., Inc.*,
    736 F.3d 1239 (9th Cir. 2013) ..........................................................31

*Hess's of Allentown, Inc. v. National Bellas Hess, Inc.*,
    169 U.S.P.Q. 673 (T.T.A.B. 1971) ...................................................11

*Hi-Tech Pharmaceuticals, Inc. v. Herbal Health Products, Inc.*,
    311 F. Supp. 2d 1353 (N.D. Ga. 2004), aff'd, 132 Fed. Appx. 348
    (11th Cir. 2005).................................................................................31

*Inmuno Vital, Inc. v. Golden Sun, Inc.*,
    49 F.Supp.2d 1344 (S.D. Fla. 1997)...........................................12, 14

*Instant Media, Inc. v. Microsoft Corporation*,
    No. C 07-02639 SBA, 2007 WL 2318948 (N.D. Cal. Aug. 13,
    2007) ..................................................................................................26

*Jellibeans, Inc. v. Skating Clubs of Georgia, Inc.*,
    716 F.2d 833 (11th Cir. 1983) ..........................................................16

*John H. Harland Co. v. Clarke Checks, Inc.*,
    711 F.2d 966 (11th. Cir. 1983) ...................................................17, 24

*McGregor-Doniger Inc. v. Drizzle Inc.*,
    599 F.2d 1126 (2d Cir. 1979) ......................................................20, 28

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Natural Footwear Ltd. v. Hart, Schaffner & Marx*,
  760 F.2d 1383 (3d Cir. 1985) ............................................................................14

*In re Nett Designs, Inc.*,
  236 F.3d 1339, 57 U.S.P.Q. 2d 1564 (Fed. Cir. 2001)......................................17

*Network Automation Inc. v. Adv. Sys. Concepts, Inc.*,
  638 F.3d 1137 (9th Cir. 2011) ...........................................................................24

*North American Medical Corp. v. Axiom Worldwide, Inc.*,
  522 F.3d 1211 (11th Cir. 2008) ....................................................................30, 31

*Odebrecht Construction, Inc. v. Secretary, Florida Department of
  Transportation*,
  715 F.3d 1268 (11th Cir. 2013) ............................................................................8

*Pandora Jewelers 1995, Inc. v. Pandora Jewelry, LLC*,
  703 F.Supp.2d 1307 (S.D. Fla. 2010).............................................................14, 34

*Ross Bicycles, Inc. v. Cycles USA, Inc.*,
  765 F.2d 1502 (11th Cir. 1985) .........................................................................24

*Sampson v. Murray*,
  415 U.S. 61 (1974)..............................................................................................31

*Sands, Taylor & Wood Co. v. Quaker Oats Co.*,
  978 F.2d 947 (7th Cir. 1992) .............................................................................11

*Scott Paper Co. v. Scott's Liquid Gold, Inc.*,
  589 F.2d 1225 (3rd Cir. 1978) ...........................................................................28

*Seiko Kabushiki Kaisha v. Swiss Watch Int'l, Inc.*,
  188 F. Supp. 2d 1350 (S.D. Fla. 2002)..............................................................32

*Sun Banks of Florida, Inc. v. Sun Federal Savings and Loans
  Association*,
  651 F.2d 311 (5th Cir. 1981) .............................................................................27

# TABLE OF AUTHORITIES
## (continued)

Page(s)

*Sweetarts v. Sunline, Inc.*,
    380 F.2d 923 (8th Cir. 1967) ............................................................13

*Tally-Ho, Inc. v. Coast Community College Dist.*,
    889 F.2d 1018 (11th Cir. 1989) .......................................................15

*Tana v. Dantanna's*,
    611 F.3d 767 (11th Cir. 2010) ...................................................10, 28

*Therma-Scan, Inc. v. Thermoscan, Inc.*,
    295 F.3d 623 (6th Cir. 2002) ..........................................................27

*Times Newspapers, Ltd. v. Times Publishing Co.*,
    No. 92-1435-CIV-T-15(A), 1993 WL 120614 (M.D. Fla. Jan. 13,
    1993) ...............................................................................................26

*Winter v. Natural Res. Def. Council, Inc.*,
    129 S. Ct. 365 (2008)..........................................................8, 30, 31

**Statutes**

15 U.S.C.
    § 1057(b) ...........................................................................................9
    § 1057(c) ...........................................................................................9
    § 1065 ..............................................................................................10
    § 1072 ..............................................................................................10
    § 1125(a) (2006) ................................................................................8
    § 1127 .........................................................................................10, 11

FLA. STAT. ANN. § 495.161 (West 1988)...............................................15

Fla. Stat. Ann. § 559.927 ........................................................................6

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

**Other Authorities**

2 McCarthy on Trademarks and Unfair Competition § 11:17 (4th ed.) .................. 18

4 McCarthy on Trademarks and Unfair Competition

    § 23:10 ................................................................................................................. 16

    § 23:95 ................................................................................................................. 28

5 McCarthy on Trademarks and Unfair Competition § 30:51 (4th ed.) ................. 33

Fed. R. Civ. P. 65(c) ............................................................................................... 35

Defendant Uber Technologies, Inc. ("Defendant") respectfully submits this opposition to the preliminary injunction motion of Plaintiff Uber Promotions, Inc. ("Plaintiff").

## I.   INTRODUCTION

Over three years after Defendant first provided its online ridesharing platform in Florida, Plaintiff asks to change the status quo and enjoin Plaintiff from using its federally-registered trademark UBER® in this State.  Because it is not feasible for Defendant to use a different name for Florida alone, the injunction would require it to shut down its service in Florida, ending the livelihood of 43,000 driver-partners and denying over 1,576,000 active riders ██████████████ ██████████████ access to safe and reliable on-demand transportation services.

What "irreparable harm" is Plaintiff suffering that requires this extraordinary relief?  People who were trying to reach Defendant called Plaintiff's phone number by mistake and left voicemail messages – most likely because Defendant has no non-emergency telephone support and customers can only reach it online. Not because they thought that an entertainment and party bus provider mainly catering to University of Florida students puts out the famous UBER® mobile application.

Plaintiff has not proven a substantial likelihood of success on its trademark infringement claim because: (1) Defendant's federal registration gives it the *prima*

*facie* nationwide right to use its UBER® mark for its ridesharing platform, (2) Plaintiff has not proven senior rights in Defendant's field of use, (3) any senior rights Plaintiff may have in UBER PROMOTIONS are limited to its Gainesville trading area, and (4) even if Plaintiff has senior rights, it has failed to prove either forward confusion (that customers use Defendant's UBER® mobile app because they think it comes from Plaintiff) or reverse confusion (that people shun Plaintiff's bus charter services because they think Defendant is behind them).

Nor has Plaintiff proven irreparable harm: the misdirected phone messages are at best an annoyance, and could be dealt with by a simple recorded greeting explaining who the caller has reached; because the parties are not direct competitors, it has lost no business to Defendant; and although it raised a concern about a stray use of the phrase "Uber promotions" in April 2014, it did not object to Defendant's use of its UBER® mark until filing this lawsuit 18 months later.

An injunction would cause Defendant tremendous harm: because it would be unfeasible for Defendant to use a different name in Florida, it would have to cease operations here. The public interest would suffer as driver partners lose their livelihoods and riders lose a key transportation alternative.

## II. STATEMENT OF FACTS

Defendant's UBER® smartphone app lets people get a ride on demand from a nearby driver registered with the UBER® service (a "driver partner").

(Declaration of Rachel Holt in Support of Defendant's Opposition to Plaintiff's

Motion for Preliminary Injunction (Dkt. 37) ("Holt Decl.") ¶¶ 2-3, 10-12.) ███

████████████████████████████████████████████████████████████

███████ (*Id.* ¶¶ 3, 51; Second Declaration of Chantal Hwang in Support of

Defendant's Opposition to Plaintiff's Motion for Preliminary Injunction ("Hwang

Decl. II"), Exh. A at 29:8-25; 31:25-32:20.)   At the end of the ride, no cash is

exchanged – the system charges the rider's credit card – and rider and driver

partner can give each other feedback.  (Holt Decl. ¶¶ 3, 11.)

To use Defendant's UBER® service, a rider must download the UBER® app

to a smartphone, open an account and provide credit card information. (*Id.* ¶¶ 5-8.)

Upon launching it, a map of the neighborhood appears showing nearby driver

partners. (*Id.* ¶¶ 10-12.) Customers know the UBER® app or the Uber.com website

is the gateway to Defendant's services.  If they are not on the app or the website,

they are not using Defendant's platform.

Defendant launched the service in 2010 as UBERCAB® and on August 31,

2010 received federal registration No. 3842416. (Attorney Declaration of Chantal

Hwang in Support of Defendant's Opposition to Plaintiff's Motion for Preliminary

Injunction (Dkt. 41) ("Hwang Decl.") ¶¶ 2-3, Exhs. A-B; Hwang Decl. II Exh. C,

Response No. 7.)  It began using the shortened mark UBER® in U.S. commerce no

later than October 28, 2010, and on June 14, 2011 received federal registration No.

3977893. (*Id.*)  Both are in good standing and cover the same software and online services comprising the UBER® platform. [1] (*Id.*)

Customers can only reach UBER® customer service online – it has no public phone number.  (Declaration of Matthew Gore in Support of Defendant's Opposition to Plaintiff's Motion for Preliminary Injunction (Dkt. 38) ("Gore Decl.") ¶ 4.)

██████████████ ██████████████████████████████

██████████████████████████████████████████████

██████████████████████████████ (Holt Decl. ¶¶ 22-23; Hwang Decl. II, Exh. C, Response No. 3.)  Today Defendant has over 1,576,000 unique active riders and 43,000 driver partners in Florida.  (Holt Decl. ¶ 52.)

Defendant entered Gainesville in August 2014. (*Id.* ¶ 28.) It partnered with the City of Gainesville in the "Freedom of Motion" program providing senior citizens with discounted rides, and with the University of Florida (UF) in a program called "Safe Rides," providing students discounted rides during certain late night hours.  (*Id.* ¶ 50; Gore Decl. ¶¶ 11-12, 14-15.)

---

[1] The registrations cover these goods and services:
• Computer software for coordinating transportation services, namely, software for the automated scheduling and dispatch of motorized vehicles, in International Class 9;
• Telecommunications services, namely, routing calls, SMS messages, and push-notifications to local third-party motorized vehicle dispatchers in the vicinity of the caller using mobile phones, in International Class 38;
• Providing a website featuring information regarding transportation services and bookings for transportation services, in International Class 39; and
• Providing temporary use of online non-downloadable software for providing transportation services, bookings for transportation services and dispatching motorized vehicles to customers, in International Class 42.

Defendant has tens of thousands of unique active riders in Gainesville; the average arrival time for a ride via the UBER® app is under four minutes. (*Id.* ¶ 51.)

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

██████████████

████████████████████████████████████████████████████████

██████████████ (*Id.* at 19:6-12; 24:7-9; Declaration of Michael Farzad (Dkt. 27) ("Farzad Decl."), Exh. 3 p. 2-6; Exh. 4.)   As of Defendant's August 31, 2010 registration for UBERCAB®, Plaintiff's services included promoting parties at Gainesville bars and nightclubs, DJs and entertainment booking, printing, creating T-shirts, catering, event planning, bus charters, and booking limousines. (*Id.* Exh. 1 p. 9; Exh. 3 p. 2-6; Exhs. 4-5.)

Plaintiff chose the name ÜBER PROMOTIONS ████████████████████████ ████████████████████████ per its founder. (Hwang Decl. II, Exh. B at 32:6-10.) Its flashy green and purple logo with geometric shapes, below left, is very different from Defendant's sleek monochrome logo, below right:

   



(Farzad Decl. ¶ 10, Exh. 4; Hwang Decl. II, Exh. B at 290:11-291:16.)  *See* Fla. Stat. Ann. § 559.927. 

(Hwang Decl. II, Exh. B at 234:2-22.) 

(*Id.* at 230:24-231:7; 231:8-232:2.) 

(*Id.*, Exh. A at 41:9-11; Exh B at 362:4-365:15.) 

(*Id.*, Exh. A at 40:12-24; Exh. B at 182:22-183:7.) 

(*Id.*, Exh. B at 210:14-211:11.)  Plaintiff allegedly received approximately 200 voice mail messages from people seeking Defendant, which has no phone number. (Farzad Decl. ¶ 30.)  Plaintiff also received a handful of e-mails from people seeking Defendant. (*Id.* ¶ 31.)

██████████████████████████████████████

████████████████████████  (Hwang Decl. II, Exh. B at 369:11-370:11.)

By letter dated April 18, 2014, Plaintiff's counsel wrote Defendant objecting to use of "Uber Promotions" on Twitter and demanding it "(1) discontinue the use of the terms 'Uber Promotions' in connection with [Defendant's] marketing and advertising campaigns (2) and undertake in writing that you will not at any time in the future use any of Uber Promotions [sic] name in any future marking [sic] or advertising campaigns, Twitter Accounts, or apply for registration of any trademarks/service mark that may be confusingly similar to Uber Promotions." (Declaration of Aaron Melville in Support of Defendant's Opposition to Plaintiff's Motion for Preliminary Injunction (Dkt. 40) ("Melville Decl.") ¶ 3.)  *It did not object to Defendant's use of the UBER® mark*. (Id. ¶ 4.)

Defendant found no such tweets, but located a reference to "Uber Promotions" on its website, and by letter dated July 14, 2014 notified Plaintiff's counsel it removed it. (*Id*. ¶¶ 7-10.)  Defendant heard nothing from Plaintiff until this lawsuit. (*Id*. ¶ 11.)

If Defendant were enjoined from using its registered UBER® mark in Florida, it would not be able to operate in this State – there is no practical way to offer its platform under a different name here.  (Holt Decl. ¶¶ 39-43.)

## III.   LEGAL ARGUMENT

A preliminary injunction is "issued to *preserve* the status quo and prevent allegedly irreparable injury until the court had the opportunity to decide upon issuing a permanent injunction." *Beta Upsilon Chi v. Machen*, 559 F. Supp. 2d 1274, 1277  (N.D. Fla. 2008) *quoting  Klay v. United Healthgroup, Inc.,* 376 F.3d 1092, 1101 n.13 (11th Cir. 2004) (emphasis added).  Plaintiff seeks to *change* the status quo.

To obtain this "extraordinary remedy," Plaintiff must show 1) substantial likelihood of success on the merits; 2) irreparable harm absent an injunction; 3) that the harm it would suffer absent an injunction would exceed the harm the injunction would cause Defendant; and 4) an injunction would not disserve the public interest.  *Winter v. Natural Res. Def. Council*, *Inc.*, 129 S. Ct. 365, 376 (2008); *Odebrecht Construction, Inc. v. Secretary, Florida Department of Transportation*, 715 F.3d 1268, 1273-74 (11th Cir. 2013).

### A.   **No Preliminary Injunction Is Warranted Because Plaintiff Has Failed to Show a Likelihood of Success on the Merits.**

To prevail on a trademark infringement claim, Plaintiff must prove (1) that it has acquired enforceable trademark rights, and (2) that the defendant's use of the mark is likely to cause confusion among consumers.  15 U.S.C. § 1125(a) (2006); *Custom Mfg. & Eng'g, Inc. v. Midway Servs., Inc.*, 508 F.3d 641, 647 (11th Cir. 2007).  Plaintiff claims use of UBER PROMOTIONS for various services, but has

not met its burden of proving use of the mark to advertise services closely related to Defendant's UBER® online ridesharing platform and senior to its registrations. Even if Plaintiff could prove senior rights in Defendant's field, Defendant's registrations freeze them to Plaintiff's Gainesville trading area. Moreover, even in the Gainesville market, Plaintiff has not proven likelihood of confusion.

    **1.**    **Plaintiff Has Failed to Show It Has Prior Enforceable Trademark Rights in Any UBER-Formative Marks Against Defendant for the Relevant Goods and Services.**

To prove senior rights, Plaintiff must overcome the presumptions Defendant enjoys through its federal registration for the UBER® mark, but has not done so.

    **a.**    **Defendant's Federal Registrations Give It Presumptive Nationwide Rights, and Confined Any Conflicting Rights Plaintiff Had To Its Trading Area As of the Registration Dates.**

Defendant's registration for the UBER® mark on the Principal Register, No. 3977893, is "*prima facie* evidence" of the validity of the mark and of the registration of the mark, of Defendant's ownership, and of Defendant's "exclusive right to use the registered mark in commerce" for the goods and services specified in the certificate, namely, Defendant's online ridesharing service and mobile app. 15 U.S.C. § 1057(b). Registration is "constructive use of the mark, conferring a right of priority, nationwide in effect," for those goods and services, with priority as of the filing date, except for someone who, prior to the filing, has used the mark and has not abandoned it. 15 U.S.C. § 1057(c). "Use" of a mark for services means using it to "identify and distinguish the services of one person" from those

of others; this is done when the mark "is used or displayed in the sale or advertising of services." *See* 15 U.S.C. § 1127.

"[A] Lanham Act plaintiff asserting common-law trademark rights under § 43(a) against the owner of a registered mark, as here, bears the burden of establishing the right to use its mark by actual use in a given territory." *Tana v. Dantanna's*, 611 F.3d 767, 780 (11th Cir. 2010). "And because registration constitutes constructive nationwide notice of the registrant's priority of use of a mark, 15 U.S.C. § 1072, only actual use occurring *prior to* such registration gives rise to enforceable common-law trademark rights, 15 U.S.C. § 1065." *Id.* (emphasis original). "Thus federal registration has the practical effect of freezing a prior user's enforceable trademark rights thereby terminating any right to future expansion beyond the user's existing territory." *Id.* at 780-81.

Defendant's registration for UBER® issued June 14, 2011, follows its registration for UBERCAB®, issued August 31, 2010. (Hwang Decl. ¶¶ 2-3, Exhs. A-B.) Because that mark consists of the UBER® mark plus the descriptive term "cab," they "'create the same, continuing commercial impression' so that consumers 'consider both as the same mark,'" and Defendant's rights in UBER® tack back to that earlier date. *See Hana Fin., Inc. v. Hana Bank,* 135 S. Ct. 907, 910, 190 L. Ed. 2d 800 (2015) (*quoting Van Dyne-Crotty, Inc., v. Wear-Guard Corp.,* 926 F.2d 1156, 1159 (Fed. Cir. 1991)). ████████████████████

████████████████████████████████████████████████

(Hwang Decl. II, Exh. A at 195:5.)

Other marks held similar enough for tacking include AMERICAN

SECURITY BANK and AMERICAN SECURITY (*American Sec. Bank v.*

*American Sec. & Trust Co.*), 571 F.2d 564, 567-68 (C.C.P.A. 1978)), THIRST-

AID–FIRST AID FOR YOUR THIRST and THIRST-AID (*Sands, Taylor & Wood*

*Co. v. Quaker Oats Co.*, 978 F.2d 947, 955 (7th Cir. 1992)), and   HESS

BROTHERS and HESS (*Hess's of Allentown, Inc. v. National Bellas Hess, Inc.*,

169 U.S.P.Q. 673 (T.T.A.B. 1971)).

Thus, Plaintiff's rights, to the extent they conflict with Defendant's, are

limited to the territory where it proves actual use of its mark as of the August 31,

2010 registration of UBERCAB®.

>    **b.    Plaintiff Has Failed to Prove Common-Law Rights to
>            Any UBER Trademark For Services Related to
>            Defendant's As of Defendant's Registration Dates.**

To establish senior common law trademark rights, Plaintiff must prove its

mark was "used or displayed in the sale or advertising of services" prior to August

31, 2010.  *See* 15 U.S.C. § 1127.  Use of a corporate name, business name, or

domain name is not enough – nor is a name and address on a business card.  *In re*

*Eilberg*, 49 USPQ2d 1955, 1957 (TTAB 1998). Plaintiff must show proof of

advertising.  Plaintiff must also prove resulting sales, but *de minimis* sales do not

establish common-law rights.  *Inmuno Vital, Inc. v. Golden Sun, Inc.*, 49 F.Supp.2d 1344, 1353 (S.D. Fla. 1997).

Plaintiff's evidence of *advertising* of any "transportation" services – much less services related to Defendant's – under the UBER PROMOTIONS name is lacking.  Plaintiff offers the Declaration of Mike Farzad and Exhibit 3 thereto to prove trademark use. (Farzad Decl., Exh. 3.)  Although it shows advertisements displaying the ÜBER PROMOTIONS and Design logo (not UBER standing alone) they are undated, so it is impossible to know whether they predate Defendant's registrations.  (*Id.*)

Page 4 of 13 of the exhibit uses the UBER PROMOTIONS logo to advertise thus:  "We can provide your organization with charter buses or school buses. Whether it's for a woodser, social, or formal, Uber Promotions has you covered," but when it was used is unknown.  (*Id.* at p. 4.)  Page 5 of 13, a "Wayback Machine" printout of Plaintiff's website as of May 30, 2009 does not advertise transportation services under the mark. (*Id.* at p. 5.)  Although it says "Ocala Poker FREE Roll Tournament! Bus picks up at 7 pm at Norman's Garage & drops off at Midnight," that merely promotes an event, not UBER PROMOTIONS transportation services. (*Id.*)

Plaintiff must also prove enough actual *sales* resulting from the advertising to show that it had established a reputation for its mark.  *Immuno Vital,*  49 F.

Supp. 2d at 1352-53, *quoting, inter alia, Sweetarts v. Sunline, Inc.,* 380 F.2d 923, 929 (8th Cir. 1967) (requiring "significant market penetration" before rights can attach).

Plaintiff's financial records and invoices indicate that before the dates of Defendants' registrations, Plaintiff booked school buses for events organized by a handful of Gainesville fraternities, but there is no proof those services were *advertised* under the UBER PROMOTIONS mark. (Farzad Decl., Exh. 4.) ███

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████ (*Id.;* Hwang Decl. II, Exh. A at 19:3-12; 24:3-9.)    Because Plaintiff has not produced evidence of advertising under the UBER PROMOTIONS mark for services related to Defendant's and substantial sales therefrom prior to Defendant's registrations, it has failed to prove senior common-law rights.

> c.    **Even if Plaintiff Can Prove Senior Common-Law Trademark Rights, They Are Limited to the Gainesville Area.**

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████ (Hwang Decl. II, Exh. B at 338:22-339:7, 348:3-349:10, 351:22-

352:22, 349:15-350-23, 353:11-17), but because those are *de minimis,* they do not establish common law rights.

"Common law trademark rights can be acquired, but only within those markets where the mark has been used and its meaning become known." *Pandora Jewelers 1995, Inc. v. Pandora Jewelry, LLC*, 703 F.Supp.2d 1307, 1312 (S.D. Fla.2010). The scope of those rights is determined by not only the type of service, but the extent to which it had established its trade, and the market to which the services were directed. *Inmuno Vital, Inc. v. Golden Sun, Inc.*, 49 F.Supp.2d, 1353.

*De minimis* sales do not create the consumer recognition required for trademark rights. In *Inmuno Vital,* sales of between 20 and 648 units in each of four states were too small to establish common law trademark rights senior to those of a federal registrant *Id.* Likewise, in *Natural Footwear Ltd. v. Hart, Schaffner & Marx*, 760 F.2d 1383, 1394 (3d Cir. 1985), the plaintiff's territorial rights were limited to New Jersey because it had achieved *de minimis* retail clothing sales elsewhere of less than $5,000 and fewer than 50 customers per state.

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████ (Hwang Decl. II, Exh. B at 338:22-339:7, 348:3-349:10, 351:22-

352:22, 349:15-350-23, 353:11-17)   Plaintiff's rights, if any, are limited to Gainesville.

### d. Plaintiff's 2015 Florida Trademark Registration Is of No Moment.

Plaintiff's Florida registration for the UBER PROMOTIONS mark, issued Sept. 28, 2015 (Farzad Decl. Exh 1), has no effect on Defendant's rights in its UBER® mark.  It certainly cannot trump Defendant's 2010 and 2011 federal registrations.  Also, as of Sept. 28, 2015, Defendant had used its mark in cities throughout Florida (Holt Decl. ¶¶ 23-30; Gore Decl. ¶¶ 5-7.), and the Florida Trademark Act preserves Defendant's common law rights.  FLA. STAT. ANN. § 495.161 (West 1988) ("Nothing herein shall adversely affect or diminish the rights or the enforcement of rights in marks acquired in good faith at any time at common law."); *Tally-Ho, Inc. v. Coast Community College Dist.*, 889 F.2d 1018, 1023-24 (11th Cir. 1989).

### 2. Assuming Plaintiff Has Met Its Burden of Proving Common-Law Trademark Rights, It Has Not Shown a Likelihood of Confusion.

Likelihood of confusion means "a likelihood that an appreciable number of ordinarily prudent purchasers are likely to be misled, or indeed simply confused, as to the source of the goods in question." *Custom Manufacturing and Engineering, Inc. v. Midway Services, Inc.*, 508 F.3d 641, 651 (11th Cir. 2007) (internal citations and quotations omitted).  "Likely" means a probability, not merely a possibility, of confusion.  *Id.*  Plaintiff argues "reverse confusion" – that is, that customers are

calling to charter UBER PROMOTIONS buses in the mistaken belief that the provider of the UBER® mobile app is now in that business. *See* 4 McCarthy on Trademarks and Unfair Competition § 23:10 (4th ed.).

The Eleventh Circuit considers seven nonexclusive factors for likelihood of confusion: 1) strength of the mark (inherently and in the market); 2) similarity of the marks; 3) similarity of the services; 4) similarity of trade channels and customers; 5) similarity of advertising media; 6) defendant's intent; and 7) actual confusion. *Frehling Enterprises, Inc. v. International Select Group, Inc.*, 192 F.3d 1330, 1335 (11th Cir. 1999). An additional factor is degree of care exercised by purchasers. *Armstrong Cork Co. v. World Carpets, Inc.*, 597 F.2d 496, 504 n.10 (5th Cir 1979).

Courts should not merely "comput[e] whether a majority of subsidiary factors indicate that such a likelihood exists," but "must evaluate the weight to be accorded the individual subsidiary facts and make the ultimate fact decision." *Jellibeans, Inc. v. Skating Clubs of Georgia, Inc.*, 716 F.2d 833, 840 n.17 (11th Cir. 1983). They must take the factors together and answer the question "Are an appreciable number of ordinarily prudent customers for Plaintiff's charter bus services likely to be misled into thinking that Defendant is actually behind them?" The answer is no.

### a. Plaintiff Has Failed to Show That Its Mark Is Strong in the Marketplace.

Strength of a mark includes conceptual strength (whether it is descriptive and weak, or arbitrary or fanciful, and strong) and commercial strength (the consumer recognition it has, and whether it is commonly used by third parties). *John H. Harland Co. v. Clarke Checks, Inc.*, 711 F.2d 966, 974-74 (11th. Cir. 1983). For reverse confusion, the focus is on the conceptual strength of the senior mark and the commercial strength of the junior mark. *A&H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 237 F.3d 198, [231] (3d Cir. 2000).

Defendant agrees its mark is well-known, and thus has commercial strength. But Plaintiff's ÜBER PROMOTIONS is not is particularly strong *conceptually*.

ÜBER PROMOTIONS is not, as Plaintiff contends, "arbitrary" or "fanciful." "Arbitrary" means a randomly-applied real word, like APPLE for computers. "Fanciful" means a coined word, like VERIZON. ███████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████ (Hwang Decl. II, Exh. A at 111:15-112:6.) ÜBER PROMOTIONS means "the best in promotions."

Laudatory marks like ÜBER PROMOTIONS are descriptive and conceptually weak. *In re Nett Designs, Inc.*, 236 F.3d 1339, 57 U.S.P.Q.2d 1564 (Fed. Cir. 2001) (THE ULTIMATE BIKE RACK a self-laudatory descriptive term

that touts the superiority of the product); *see* 2 McCarthy on Trademarks and Unfair Competition § 11:17 (4th ed.). ████████████████████████

████████████████████████████████████ (Hwang Decl. II, Exh. B at 32:2-14.)

Searching the Patent and Trademark Office database at tmsearch.uspto.gov shows 191 filings for marks containing the word UBER. The presence of third-party use of marks may reduce strength and thus confusion. *Frehling Enterprises*, 192 F.3d 1330, 1336. Unlike with a unique mark like IKEA or DISNEY, purchasers are less likely to assume that the owners of a common mark are the same, and more likely to differentiate them. That is why purchasers have learned to differentiate between UNITED® for "transportation of persons, mail and property by air", owned by United Airlines, Inc., Reg. No. 676462, and UNITED® for "transportation of goods by truck," owned by United Van Lines, LLC., Reg. No. 3866549, and why the marks coexist on the trademark register and in the marketplace. Because Plaintiff's mark is not conceptually strong, this factor does not favor likelihood of confusion.

> **b.** **Viewed in the Context in Which Customers Encounter Them, the Parties' Marks Are Significantly Different**

The court should not look at the marks in a vacuum – it must consider "the overall impression created by the marks, including a comparison of the appearance, sound and meaning of the marks, as well as the manner in which they are

displayed."  *E. Remy Martin & Co. v. Shaw-Ross Intl Imps., Inc.*, 756 F.2d 1525, 1531 (11th Cir. 1985).  Likelihood of confusion is "related not to the *nature* of the mark but to its *effect* 'when applied to the goods of the applicant.' The only *relevant* application is made in the marketplace. The words 'when applied' do not refer to a mental exercise, but to all of the known circumstances surrounding use of the mark." *In re E.I. du Pont de Nemours & Co.*, 476 F.2d 1357, 1360-61 (C.C.P.A. 1973) (original emphasis).

ÜBER PROMOTIONS is a phrase describing "the best in promotions." Defendant's mark UBER does not modify anything – it stands alone.  The marks look and sound differently, have different meanings, and create different commercial impressions.

Plaintiff's ÜBER PROMOTIONS logo is bright green and purple in a splashy geometric design, a flashy look evocative of the nightclub scene, and customers encounter it on Plaintiff's marketing materials depicting promotional and entertainment-related services. (Farzad Decl., Exh. 3, p. 3.)  Defendant's UBER® mark uses a sleek monochrome stylization evoking its high-tech platform. (Gore Decl. ¶ 2, Exhs. B, E.)

   

DRIZZLE for women's jackets and DRIZZLER for golf jackets were not likely to be confused even though "the typewritten and aural similarity of the two marks 'approaches identity'" because the *context* in which customers encountered them, including use of a house mark and distinctive plaid lettering, reduced similarity. *McGregor-Doniger Inc. v. Drizzle Inc.*, 599 F.2d 1126, 1134 (2d Cir. 1979). GLOW and GLOW BY J. LO for beauty and personal care products were "visually distinct" as they appeared on the products and differences in the parties' packaging "tends to minimize any confusion generated by the similarity in the sound and meaning of the trademarks." *Glow Industries, Inc. v. Lopez,* 252 F. Supp. 2d 962, 996-97 (C.D. Cal. 2002).

Especially in context, anyone who uses Defendant's service and comes across Plaintiff's advertising will know the difference. This weighs against likelihood of confusion.

### c. The Parties' Services Are Not Closely Related.

Services are "related" if they "are the kind that the public attributes to a single source." *Frehling Enterprises*, 192 F.3d, at 1338. Although the parties' services are superficially similar as they involve passenger transportation, the needs they fill and the ways they are requested and provided are so different that an ordinarily prudent customer would not expect them to come from the same source.

Plaintiff's own co-founder Friedman knows this well. ███████████



(Hwang Decl. II, Exh. A at 42:6-23, 43:6-9.)

Defendant's UBER® platform matches individuals who need rides immediately with drivers ready to take them. (Holt Decl. ¶¶ 5-12, 16.) The average pickup wait in Gainesville is four minutes. (*Id.* ¶ 51.) Defendant does not provide the vehicles – drivers use their own cars. (*Id.* ¶¶ 13-14.) At the end of the ride, the system calculates the fare, determined by an algorithm that adjusts pricing based on demand, and charges the rider's credit card. (*Id.* ¶¶ 3-4.) It is not surprising that Mr. Friedman chooses this convenient method of getting home at night and not Plaintiff's services.

Plaintiff mainly provides group transportation in buses or the occasional limo to and from a specific event at an entertainment or sporting venue. (Farzad Decl., Exh. 4.) ███████████

███ (Hwang Decl. II, Exh. B at 230:24-231:7; 234:2-22.) ███████████

██████████████████████████████████████

████████████████████████ (*Id*. at 362:4-365:15.)

No ordinarily prudent user of Defendant's platform would be likely to think that the provider of a high-tech ridesharing platform is also putting on entertainment events and taking groups there in party buses. Nor would any ordinarily prudent customer of Plaintiff's think that the impresarios of Uber Promotions are behind the famous UBER® service.

██████████████████████████████████████

████████████ (*Id*. at 126:15-23.) While many businesses have mobile apps, the mere fact they do does not make them all "related." There is no evidence that Plaintiff plans to start a competitive online ridesharing platform, nor any evidence it is capable of doing so.

Defendant's UberPOOL, UberBOAT, and UberEVENTS are just variants of its ridesharing platform, and not closely related to what Plaintiff does. UberPOOL is an option on the platform that lets multiple users share a ride, like a carpool. (Holt Decl. ¶ 27.) UberBOAT was a temporary option that allowed UBER® app users to summon rides on yachts across Biscayne Bay during Art Basel. (*Id*. ¶¶ 33-34.) UberEVENTS is a way to pre-pay for rides for others to get to weddings, business meetings, and the like. (*Id*. ¶¶ 31-32.) Riders still connect with drivers via

the UBER® app the normal way – the only difference is that someone else paid. (*Id*.)

The parties' services rely on very different types of expertise, talent, and technology.  They are not closely related, and this weighs against likelihood of confusion.

### d.  Customers Purchase the Parties' Services Through Different Sales Channels.

"Dissimilarities between the retail outlets for and the predominant customers of plaintiff's and defendant's goods lessen the possibility of confusion, mistake, or deception." *Frehling Enterprises*, 192 F.3d at 1339.  If customers do not find the products in the same stores, they are less likely to buy them by mistake. The same is true of services.

████████████████████████████████████████████

████████████████████████████████████████████

████████████ (Farzad Decl., Exh. 4, pp. 2-5, 11-12, 15-16, 21; Hwang Decl. II, Exh. B at 182:22-183:7.)   A customer cannot purchase rides via Defendant's platform without first downloading the UBER® mobile app and creating an account. (Holt Decl. ¶¶ 5-8.)

In each case the customer must take deliberate steps and create a direct relationship with the seller, which ensures the customer knows with whom he or

she is dealing.  But the relationships are formed differently:  one by personal interaction, and one by mobile app.  This factor makes confusion unlikely.

### e.    The Parties Promote Their Services by Different Advertising Methods.

Plaintiff asserts that both companies promote their services via websites, search engines, and social media. "Given the broad use of the Internet today, the same could be said for countless companies.  Thus this factor merits little weight." *Network Automation Inc. v. Adv. Sys. Concepts, Inc.*, 638 F.3d 1137, 1151 (9th Cir. 2011) (*quoting* Playboy Enters., Inc. v. Netscape Commc'ns Corp., 354 F.3d 1020, 1028 (9th Cir.2004)).

What matters is *how similar the actual ad campaigns are*.  "The greater the similarity in advertising campaigns the greater the likelihood of confusion." *Ross Bicycles, Inc. v. Cycles USA, Inc.*, 765 F.2d 1502, 1508 (11th Cir. 1985).  There is no evidence Defendant uses gaudy ads like those Plaintiff directs to its youthful partygoers. (Farzad Decl., Exh. 3.) This factor weighs against likelihood of confusion.

### f.    Defendant Adopted Its Mark in Good Faith and Certainly Not to Create Confusion with Plaintiff.

At least in a forward confusion case, if a defendant "adopted a mark with the intent of deriving benefit from the reputation of the plaintiff," that may support an inference of likelihood of confusion. *John H. Harland Co. v. Clarke Checks, Inc.*, 711 F.2d 966, 977 (11th Cir. 1983).  In a reverse confusion case like this, there

would be no such motive, because under that theory, customers mistakenly think the senior user is the same as the junior user they already know.  Defendant did not build its worldwide business under the UBER® mark to usurp goodwill of a local nightlife company in Gainesville.

Nor did Defendant act in disregard of Plaintiff's rights. ████████████████

████████████████████████████████████████████████████████

████████████████████ Hwang Decl., Exhs A-B; Hwang Decl. II, Exh. at Response No. 7.) This factor is neutral.

### g. Plaintiff's Evidence of "Actual Confusion" Only Shows Inattention and Indifference, Not Confusion As To Source.

If someone decides to buy a CADILLAC trailer because he or she mistakenly thinks it is made or endorsed by the makers of CADILLAC cars, that is confusion as to the source of the goods and is relevant to trademark infringement. But if someone wanted to telephone the Cadillac car company, tried to look up its phone number, and mistakenly used the number of the Cadillac trailer company, that is not confusion as to source, and does not show infringement.

This is because a likelihood of confusion occurs when "an appreciable number of ordinarily prudent purchasers are likely to be misled, or indeed simply confused, *as to the source of the goods in question*." *Custom Manufacturing and Engineering, Inc. v. Midway Services, Inc.*, 508 F.3d 641, 651 (11th Cir. 2007) (citing *New Sensor Corp. v. CE Distribution LLC,* 303 F.Supp.2d

304, 310–11 (E.D.N.Y.2004) (emphasis added). "Relevant confusion is that which affects *purchasing decisions*, not confusion generally." *Instant Media, Inc. v. Microsoft Corporation,* No. C 07-02639 SBA, 2007 WL 2318948 (N.D. Cal. Aug. 13, 2007), at *14 (emphasis added).

Plaintiff says it "receives multiple calls, voicemails, and e-mails each week from the public looking for or complaining about UT and/or its goods and/or services." (Farzad Decl. ¶ 29.)  But that is not confusion as to source, just use of the wrong phone number or e-mail address.

Courts have emphasized the difference between source confusion and confusion from "inattention and indifference." *Times Newspapers, Ltd. v. Times Publishing Co.*, No. 92-1435-CIV-T-15(A), 1993 WL 120614, at *5 (M.D. Fla. Jan. 13, 1993). The court in *Times Newspapers* found that mail sent to plaintiff but meant for defendant was "inevitable" and "'not trustworthy evidence of confusion of source.'" *Id.* at *5 (quoting *Time v. T.I.M.E., Inc.*, 123 F.Supp 446 (S.D. Cal. 1954), misdirected letters and telephone calls not trustworthy evidence of actual confusion). Instead, this showed consumers' "'inattention and indifference,'" and not the result of defendant's use of the mark.  *Id.* (quoting *Belleville News-Democrat, Inc. v. St. Clair County Publishers, Inc.*, 167 N.E.2d 573 (Ill. App. 1960)).

The Southern District of Florida has held that phone calls misdirected by telephone operators were not evidence of actual confusion. *E.R. Squibb & Sons, Inc. v. Princeton Pharmaceutical, Inc.*, No. 88-6527-Civ-ROETTGER, 1990 WL 272707, at *8 (S.D. Fla. Sept. 4, 1990). Likewise, the Eighth Circuit held that plaintiff's receipt of defendant's mail and phone calls only "show[ed] inattentiveness on the part of the caller or sender rather than actual confusion." *Duluth News-Tribune v. Mesabi Publishing Company*, 84 F.3d 1093, 1098 (8th Cir. 1996). And the Sixth Circuit held that e-mails meant for defendant but misdirected to plaintiff showed only that the consumers were "inattentive and careless, as opposed to being actually confused." *Therma-Scan, Inc. v. Thermoscan, Inc.*, 295 F.3d 623, 636 (6th Cir. 2002). That is what we have here.

A more reasonable explanation for the misdirected calls is that *Defendant has no public phone number for customers.* (Gore Decl. ¶ 4.) Customers can only reach Defendant through the mobile app or online. The callers probably tried to find a number for "Uber," and got or were given Plaintiff's.

As for the handful of emails, if they show confusion, it is *de minimis*, given that Defendant has over 1,576,000 users statewide and tens of thousands in Gainesville. (Holt Decl. ¶¶ 51-52.) The number of incidents of alleged confusion must be analyzed in context of the amount of business conducted by the parties and the extent of their advertising. *Sun Banks of Florida, Inc. v. Sun Federal Savings*

*and Loans Association*, 651 F.2d 311, 319 (5th Cir. 1981). Even numerous incidents can be insufficient when compared to the parties' high numbers of sales of products or services. *Scott Paper Co. v. Scott's Liquid Gold, Inc.*, 589 F.2d 1225, 1231 (3rd Cir. 1978).

Neither the misdirected calls nor e-mails prove actual confusion; this factor does not weigh in Plaintiff's favor.

### h. The Parties' Customers Are Careful in Purchasing Their Respective Services.

The Eleventh Circuit has held that in addition to the traditional seven, "new factors may merit consideration in determining whether there is a likelihood of confusion." *Tana v. Dantanna's*, 611 F.2d at 780. One is the degree of care exercised by purchasers. *Armstrong Cork Co,* 597 F.2d at 504 n.10. That both parties' purchases are careful reduces likelihood of confusion.

To use Defendant's service a customer must download Uber's mobile app, create an account, and provide a credit card number. (Holt Decl. ¶¶ 5-8.) A reasonably prudent buyer will be careful about providing this information. This multiple-stage process gives the customer ample opportunity to look into the provider and consider whether to proceed.

Those seeking Plaintiff's services also exercise a high level of care. Where services are expensive, a buyer will be more careful. 4 McCarthy on Trademarks and Unfair Competition § 23:95 (4th ed.); *McGregor-Doniger Inc. v. Drizzle Inc.*,

599 F.2d 1126, 1137 (2d Cir. 1979).   One looking to hire Plaintiff for group transportation must agree on terms and enter into a contract with a significant price tag. (See Farzard Decl. Exh., 4, pp. 6, 8-10, 43, 45, 48-50.) A fraternity member entrusted with the house's funds will be very careful before committing his organization to paying a large sum to Plaintiff.

The care both parties' customers use weighs against likelihood of confusion.

### B. Plaintiff Has Not Shown That It Will Be Irreparably Harmed If Defendant Is Not Enjoined From Using Its UBER® Trademark in Florida.

Defendant first offered its UBER® platform in Florida nearly three and a half years ago, and has been continuously providing it in Florida for over two years and in Gainesville for nearly a year and a half. (Holt Decl. ¶¶ 24-25, 28; Gore Decl. ¶ 7, Exh. B.) ████████████████████████████ (Hwang Decl. II, Exh. B at 369:11-370:11.)

Plaintiff argues the Court should presume irreparable harm from likelihood of confusion, but the trend in case law is that the presumption no longer exists. Rather, Plaintiff must make an *actual showing of imminent irreparable injury* if Defendant is not blocked from using its federally-registered mark.

Plaintiff's proof of irreparable harm consists only of misdirected phone calls and some e-mails.  Annoying, perhaps, but not harm to Plaintiff's business, much less *irreparable* harm.  Certainly if it were causing irreparable harm, Plaintiff

would not have waited so long to seek an injunction; nor would Plaintiff's co-founder and President use the UBER® service weekly.

> **1.  Even If Plaintiff Proved a Likelihood of Confusion, That Would Not Entitle It to a Presumption of Irreparable Harm.**

The Eleventh Circuit has noted that the Supreme Court's decision in e*Bay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388 (2006) "calls into question whether courts may presume irreparable harm merely because a plaintiff in an intellectual property case has demonstrated a likelihood of success on the merits." *North American Medical Corp. v. Axiom Worldwide, Inc.*, 522 F.3d 1211, 1227 (11th Cir. 2008).  It explained *eBay* held that the Patent Act indicates "that injunctive relief 'may' issue only in accordance with the principles of equity," and thus the Federal Circuit's "categorical rule that permanent injunctions shall issue once infringement is established" violated those principles.  *Id.* at 1228 (*quoting eBay,* 547 U.S. at 393-94).  It noted "a strong case can be made that *eBay's* holding necessarily extends to the grant of preliminary injunctions under the Lanham Act." *Id.*

After *North American Medical*, the Supreme Court further altered the ground rules for benchmarking irreparable harm in *Winter v. Natural Res. Def. Council, Inc.*: a plaintiff seeking a preliminary injunction must "demonstrate that irreparable injury is *likely* in the absence of an injunction," not merely a "possibility."  *Winter,* 555 U.S. at 22 (emphasis in original) (citations omitted). Two other Circuits have since held that *eBay* and *Winter* together mean there is no

presumption of irreparable harm in a trademark case. *See Ferring Pharm., Inc. v. Watson Pharm., Inc.,* 765 F.3d 205, 217 (3d Cir. 2014) and *Herb Reed Enters., LLC v. Fla. Entm't Mgmt., Inc.*, 736 F.3d 1239, 1250 (9th Cir. 2013).

*North American Medical*, preceding *Winter*, did not go so far as to hold the presumption no longer applies in trademark cases. But it did reverse a preliminary injunction and remanded it with instructions to consider *eBay*. 522 F.3d at 1228. Even if Plaintiff proved infringement, that would not automatically establish irreparable harm.

### 2. The Alleged Instances of Actual Confusion Are Not Sufficient to Support a Finding of Irreparable Harm.

To prove irreparable harm, Plaintiff relies only on "numerous instances of actual confusion in the marketplace." Pl. Brief at 36. These "instances" do not show confusion as to *source* of a party's services. Plaintiff speculates about harm to reputation or goodwill, but offers no proof of harm that would not be compensable. "The key word in this consideration is irreparable. Mere injuries, however substantial, in terms of money, time and energy . . . are not enough," *Sampson v. Murray*, 415 U.S. 61, 90 (1974) (internal citations omitted), and Plaintiff's alleged injuries are not substantial

### 3. Plaintiff's Lengthy Delay in Seeking an Injunction Belies Any Likelihood of Irreparable Harm.

A party's "delay in seeking a preliminary injunction weighs against a finding of irreparable harm." *Hi-Tech Pharmaceuticals, Inc. v. Herbal Health Products,*

*Inc.*, 311 F. Supp. 2d 1353, 1357 (N.D. Ga. 2004), aff'd, 132 Fed. Appx. 348 (11th Cir. 2005) (injunction denied where the plaintiff waited three months to sue and four more months to seek preliminary injunction).  Such delay "tends to neutralize any presumption that infringement alone will cause irreparable harm pending trial, and such delay alone may justify denial of a preliminary injunction for trademark infringement." *Seiko Kabushiki Kaisha v. Swiss Watch Int'l, Inc.*, 188 F. Supp. 2d 1350, 1355-56 (S.D. Fla. 2002) (denying injunction where plaintiff waited 12 months from notice to file suit).

Not only should Plaintiff have been on notice of Defendant's rights in its UBER® mark from its 2011 registration, Defendant operated Florida in August 2012 and continuously since at least as early as November 2013. (Holt Decl. ¶¶ 22-25.) ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████ (Hwang Decl. II, Exh. B at 357:10-13; Farzad Decl. ¶ 39, Exh. 21), and fell silent after Defendant addressed that concern in July 2014. (Melville Decl. ¶ 11.)  Defendant waited over one and a half years to sue, and another two and a half months to seek an injunction.  This "undercuts any sense of urgency and, therefore, Plaintiff has failed to demonstrate sufficient need for a preliminary injunction." *Seiko,* 188 F. Supp. 2d at 1355-56.

### C.   The Balance of Hardships Favors Defendant as an Injunction Would Effectively Push Defendant Out of Florida, While Denial Might Cause Misdirected Calls and E-Mails to Continue.

"If the granting of a preliminary injunction would cause defendant financial loss and damage to business reputation which significantly outweighs any damage to plaintiff, then this is a negative factor indicating that preliminary injunctive relief is not appropriate."  5 McCarthy on Trademarks and Unfair Competition § 30:51 (4th ed.).   If the Court enjoined Defendant from using its registered trademark in Florida, Defendant would have to halt operations in the state, because, as a practical matter, it could not provide its services and mobile app under a different name for this market.  (Holt Decl. ¶¶ 39-49.)

Defendant's network of driver-partners is a key part of its business, and if Defendant were enjoined pending litigation, competitors could enter the market, take driver-partners Defendant has worked hard to recruit, and Defendant might never get them back.  (*Id.* ¶¶ 17, 44-45, 48.)

If the Court denied the injunction, Plaintiff might continue to receive calls and e-mails for Defendant.  But granting the injunction might make the problem worse, as frustrated customers unable to use Defendant's platform start calling Plaintiff about the problem.

An injunction is not the solution to the misdirected calls.

██ ████ ██████ █████████ ██

█████████████████████████████████████

██████████         (Hwang Decl. II, Exh. A at 208:3-8; Exh. B at 211:3-

21.) The hardships an injunction would cause Defendant far outweigh any benefit

to Plaintiff.

**D.    An Injunction Would Harm Defendant's Customers, Drivers, and the Florida Economy Generally, and Therefore It Would Not Be in the Public Interest.**

Defendant has become an essential service to Florida consumers, an

important source of income to its driver partners, a boon to the Florida economy,

and to the community at large.  Defendant "has so pervasively penetrated that

market, that its sudden removal would disserve the public interest." *Pandora*

*Jewelers 1995, Inc. v. Pandora Jewelry*, LLC, 703 F. Supp. 2d 1307, 1317 (S.D.

Fla. 2010).

43,000 Florida driver partners earn income using Defendant's UBER®

platform, giving rides to over 1,576,000 unique active Floridian riders. (Holt Decl.

¶ 52.)  Defendant forecasts that by the end of 2020, Floridians would take home

more than $2 billion through the UBER® platform, generating more than 130,000

job opportunities here.  (*Id.* Exh. T, p. 1.)

Defendant's "Freedom of Motion" gives Gainesville seniors greater mobility

at subsidized fares. (Gore Decl. ¶¶ 14-15.)  Defendant's "Safe Rides" program

gives students discounted rides when drunk driving is most likely.  (Gore Decl. ¶¶ 11-12.)  A Temple University study found that the availability of Defendant's service reduces drinking and driving deaths.  (Holt Decl. ¶ 54 and Exhs. U, V, and W.)  Defendant's research shows that in Miami, its ridership peaks at the same time as historical drunk-driving related crashes. (*Id.*, Exh. Q, p. 4.)

The public would lose all of these benefits if Defendant were enjoined.

### E.    Any Injunctio███████e Conditioned on a Substantial Bond of No Less than █████

"The Court may issue a preliminary injunction only if the movant gives security in the amount the Court determines is proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c).  A statewide injunction would deprive Defendant of revenue of ████ per month. (Declaration of Joe Zhou in Support of Defendant's Opposition to Plaintiff's Motion for Preliminary Injunction (Dkt. 42) ¶ 10.) Between now and the end of the trial scheduled for November 28, 2016, that is about ████ (*Id.*) The Court should condition any injunction on a bond of that amount.

## IV.    CONCLUSION.

No ordinarily prudent purchaser will confuse the parties' services. Misdirected calls and e-mails are not irreparable harm, and do not warrant an injunction that would force Defendant to shut down its UBER® platform in Florida

and deny the State and its people its many benefits.  The Court should deny this

untimely motion.

Respectfully submitted,

Dated:        January 22, 2016

                        COOLEY LLP


                        By:/s/ John W. Crittenden
                        _____
                            John W. Crittenden (101634) (*Pro Hac Vice*)
                            jcrittenden@cooley.com
                            Brendan J. Hughes (497332) (*Pro Hac Vice to
                            be filed*)
                            bhughes@cooley.com
                            John Paul Oleksiuk (283396) (*Pro Hac Vice*)
                            jpo@cooley.com
                            Chantal Z. Hwang (275236) (*Pro Hac Vice*)
                            chwang@cooley.com
                            101 California Street, 5th Floor
                            San Francisco, CA  94111-5800
                            Phone:    (415) 693-2000
                            Fax:        (415) 693-2222

                            Ury Fischer (048534)
                            ufischer@lottfischer.com
                            Adam Diamond (091008)
                            adiamond@lottfischer.com
                            LOTT & FISCHER, PL
                            355 Alhambra Circle, Suite 1100
                            Coral Gables, FL  33134
                            Phone:    (305) 448-7089
                            Fax:        (305) 446-6191

                            Attorneys for Defendant
                            UBER TECHNOLOGIES, INC.

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

Pursuant to N.D. Fla. Loc. R. 7.1(F), the undersigned counsel for Defendant affirms that the foregoing memorandum does not exceed 8,000 words and, in reliance on the word-processing used to prepare the memorandum, confirms that the memorandum contains precisely 7,995 words.

By: /s/ Chantal Z. Hwang
Chantal Z. Hwang (pro hac vice)
Email: chwang@cooley.com
Attorney for Defendant
January 22, 2016

# CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on January 22, 2016, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to electronically receive Notices of Electronic Filing.

/s/ Chantal Z. Hwang
Chantal Z. Hwang

# SERVICE LIST

*Uber Promotions, Inc. v. Uber Technologies, Inc.*
*Case No. 1:15-cv-00206-MW-GRJ*

Service via CM/ECF generated Notices of Electronic Filing:

Alexander D. Brown
Scott D. Smiley
**The Concept Law Group, P.A.**
200 South Andrews Avenue
Museum Plaza, Suite 100
Ft. Lauderdale, FL  33301
Telephone:  754-300-1500
Facsimile:   754-300-1501
E-mail:      Abrown@conceptlaw.com
E-mail:      Scott@conceptlaw.com

*Attorneys for Plaintiff*

Joseph V. Priore
**Santucci Priore, P.L.**
200 South Andrews Avenue
Museum Plaza, Suite 100
Ft. Lauderdale, FL  33301
Telephone:  954-351-7474
Facsimile:   954-351-7475
E-mail:       jpriore@500law.com

*Attorney for Plaintiff*